UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                        :
In re:                                  :     Chapter 11
                                        :
EAST 44TH REALTY, LLC,                  :     Case No. 05-16167 (RDD)
                                        :
                        Debtor.         :
-------------------------------------------------------X
JOSEPH BILDIRICI,                       :     Case No.: 07 CV 8799 (CM)(THK)
                                        :
            Plaintiff-Appellant,        :
                                        :
        -against-                       :
                                        :
DAVID R. KITTAY, as CHAPTER 11          :
TRUSTEE FOR EAST 44TH REALTY, LLC,      :
                                        :
            Defendant-Appellee.         :
-------------------------------------------------------X


**BRIEF OF DAVID R. KITTAY, CHAPTER 11
TRUSTEE FOR THE ESTATE OF EAST 44TH REALTY, LLC,
IN OPPOSITION TO APPELLANT'S APPEAL**


**David R. Kittay**
**Kittay & Gershfeld, P.C.**
**100 White Plains Road, 2nd Floor**
**New York, New York 10501**
**Telephone: (914) 332-8000**
**Facsimile: (914) 332-8001**

**Attorneys for the Appellee**

**Table of Contents**

TABLE OF AUTHORITIES.................................................................................iii

STATEMENT OF ISSUE.................................................................................1

STANDARD OF REVIEW.................................................................................1

STATEMENT OF THE CASE.................................................................................1

STATEMENT OF FACTS.................................................................................3

      Pre-Petition Events.................................................................................3

      Litigation in the Chapter 11 Case.................................................................................5

      The Decision to Sell the Lease.................................................................................7

      Potential Obstacles to the Sale.................................................................................7

      Calculation of Cure Amounts.................................................................................8

ARGUMENT.................................................................................12

    I.      FAILURE TO OBTAIN A STAY OF THE SALE OF
            THE GROUND LEASE OR INCLUDE PARTIES
            IN INTEREST RENDERS THIS APPEAL MOOT.................................................12

    II.     THE BANKRUPTCY COURT DID NOT ABUSE ITS
            DISCRETION WHEN IT FOUND THE
            SETTLEMENT WITHIN THE RANGE
            OF REASONABLENESS.................................................................................14

           A.    The Probability of Success in the Various Litigations Compelled
                  the Court to Find in Favor of the Settlement.................................15

                 1.    Lease Litigation.................................................................15
                 2.    Sub-Lease Litigation.................................................16
                  3.    Fee Litigation.................................................................16

B.    The Complexity of the Litigation, and the Expense, Inconvenience and Delay It Would Occasion Supported Finding in Favor of the Settlement.................................................................................20

C.    The Vast Majority of the Debtor's Creditors Supported the Settlement............................................................21

D.    The Benefits Received by the Classes Support Approval of the Settlement............................................................22

E.    The Settlement Was Negotiated by Able Counsel Working at Arms' Length..................................................22

F.    The Nature and Breadth of the Releases Were Appropriate and Support the Settlement..................................23

G.    The Record Amply Supported the Settlement............................................23

CONCLUSION.................................................................................25

# **TABLE OF AUTHORITIES**

## **Case Law**

*Evergreen Int'l Airlines v. Pan Am Corp. (In re Pan Am)*, 1995 WL 366356
(S.D.N.Y. June 20, 1995)........................................................................................................13

*In re Best Products Co., Inc.*, 148 B.R. 413, 414 (Bankr. S.D.N.Y. 1992)....................................17

*In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir. 1993)................................................... 13

*In re Child World, Inc.,* 161 B.R. 349, 353 (Bankr. S.D.N.Y. 1993)............................................17

*In re Crown Books Corp.*, 269 B.R. 12, 15 (Bankr. D. Del. 2001)........................................17, 18

*In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).............15

*In re Nicfur-Cruz Realty Corp.*, 50 B.R. 162 (Bankr. S.D.N.Y. 1985)........................................17

*In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988)................................................................15

*In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983), *cert denied* 464 U.S. 822 (1984)..................14

*Iridium Operations LLC v. Official Comm. of Unsecured Creditors and JP Morgan
Chase Bank, N.A.*, 478 F.3d 452, 461 n.13 (2d Cir. 2007) (*In re Iridium Operating LLC*).............1

*Kassover v. Gibson*, 2003 WL 21222341 *2 (S.D.N.Y. May 27, 2003)..................................12, 13

*Metromedia Fiber Network*, 416 F.3d 136 (2d Cir. 2005)............................................................23

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric*, 127 S.Ct. 1199 (2007)...17

*Urban Retail Properties v. Loews Cineplex Entertainment Corp.*, 2002 WL 535479 *9
(S.D.N.Y. 2002)......................................................................................................................17

## **Statutory Authority**

11 U.S.C. § 365.............................................................................................................1, 2, 8, 9, 17

11 U.S.C. § 506(b)......................................................................................................................19

Title 22 Official Compilation of Codes, Rules and Regulations of the State of New York,
Section 1215.2(2).......................................................................................................................24

## STATEMENT OF ISSUE

The issue on appeal is whether, after analyzing the record before it, the bankruptcy court abused its discretion in holding that the settlement (the "Settlement") negotiated by David R. Kittay (the "Trustee"), as Chapter 11 Trustee for East 44th Realty, LLC (the "Debtor" or the "Estate"), between and among the Debtor, East Forty-Fourth Street, L.L.C. (the "Landlord") and New York Community Bank (the "Lender") was within the range of reasonableness as it enabled the Trustee to assume and assign the Debtor's sole asset for the benefit of the Debtor's creditors.

## STANDARD OF REVIEW

A bankruptcy court's articulation of the standard by which it evaluates a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 is a legal issue subject to *de novo* review.  Application of that standard is reviewed using an abuse of discretion analysis.  *Iridium Operations LLC v. Official Comm. of Unsecured Creditors and JP Morgan Chase Bank, N.A.*, 478 F.3d 452, 461 n.13 (2d Cir. 2007).

## STATEMENT OF THE CASE

By Order dated August 9, 2007 (the "Settlement Order"), the bankruptcy court for the Southern District of New York (the "Bankruptcy Court") entered an order approving the Settlement between the Debtor, the Landlord and the Lender.  As a result of the Settlement, the Landlord and the Lender removed the cloud on the Debtor's sole asset, a ground lease and related sub-leases, by agreeing the ground lease had not terminated and was capable of being assumed. The Settlement also settled approximately $4 million in cure costs arguably owed to the Landlord for $1.7 million, thereby allowing the Trustee to satisfy his cure obligations under Title 11 of the

United State Code (the "Bankruptcy Code") Section 365 and sell[1] the lease. As a result of the Settlement, the lease was sold, the Landlord's and the Lender's claims were satisfied and the Trustee anticipates a significant distribution to the Debtor's creditors and, possibly, to the Debtor's equity holders ("Equity"). If the Settlement Order is overturned, years of rancourous litigation will resume, the cost of which will be borne by this Estate and its creditors.

The Bankruptcy Court issued the Settlement Order after considering: (A) the Trustee's fifty-two page motion[2] which included: (i) the explicit lease provisions authorizing payment of legal fees to the Landlord's attorneys; (ii) the Trustee's detailed review of all of the Landlord's attorneys' time records; and (iii) the law supporting the compromise and settlement of the legal fees and the right to the sub-lease proceeds, (B) Appellant's *Objection to Cure Claim*, dated August 6, 2007 (the "Objection"), and (C) the Trustee's *Response to Objection to Cure Claim*, dated August 7, 2007 (the "Response") which: (i) detailed the work performed in analyzing the Lender's attorneys' fees and the explicit note, mortgage and cash collateral provisions authorizing the payment of attorneys' fees; and (ii) refuted each of the misstatements in the *Objection* on a paragraph-by-paragraph basis.

After hearing oral argument at the August 8, 2007 hearing on the Motion (the "Hearing"), the Court issued its decision. The decision specifically: (A) addressed the work performed by

---

[1] For purposes of these pleadings, the Trustee uses the word "sell" to describe the disposition of the ground lease and related sub-leases. In actuality, the lease was assumed and assigned pursuant to Bankruptcy Code Section 365.

[2] The motion referred to is the Trustee's *Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Seeking Approval of Global Stipulation Between and Among David R. Kittay, Chapter 11 Trustee for Debtor, New York Community Bank and East Forty-Fourth Street L.L.C.*, dated July 27, 2007 (the "Motion").

2

the Trustee in reviewing the Lender's and the Landlord's attorneys' time records and found the time reasonable and compensable; (B) recognized that the existence of the lease was still subject to appeal and would cloud the sale of the lease; and (C) acknowledged the sub-lease proceeds issue, considered the risk that the Landlord would win that litigation and the costs associated with litigating the issue.  The Bankruptcy Court also found that the Debtor had failed to make certain repairs identified to it in 2003 and that the Landlord had the right to pursue its remedies under the lease as a result of Appellant's failure to make the repairs.  Finally, the Bankruptcy Court ruled that the releases and indemnity provisions were appropriate in the context of the case.

## STATEMENT OF FACTS

### Pre-Petition Events

Prior to the sale, the Debtor's only asset in this Chapter 11 case was a claim to rights as a tenant under a ground lease (the "Ground Lease") to real property located at 228-238 East 44th Street, New York, New York (the "Property").  The Debtor also had corresponding rights as a sub-lessor to space leases (the "Sub-Leases", the Sub-Leases and the Ground Lease are collectively referred to hereinafter as the "Lease").  *Motion*, ¶1.

In December 2002, the pre-petition Debtor[3] took an assignment of the Lease from CS East 44th Street ("CS").  CS failed to repair the Property as required under the terms of the Lease.  The Landlord refused to consent to the assignment and served a notice of default on the Debtor and CS for breach of contractual obligation to make necessary repairs.  *Motion*, ¶5.  In response,

---

[3]    Solely for purposes of these pleadings, the pre-petition Debtor will be referred to as the Debtor.

3

the Debtor began what would become a pattern of litigation by commencing an action in New York State Supreme Court ("State Court") seeking, among other things, a declaration that there had been no breach of the Lease and seeking, and obtaining, a *Yellowstone* injunction. *Motion*, ¶6.

The Landlord and the Debtor resolved the litigation pursuant to a settlement agreement which required the Debtor to rectify all of the previously noted repairs and any additional required work, all of which the Debtor was precluded from contesting. *Motion*, ¶7.

The Debtor failed to satisfy the terms of the settlement and the Landlord served the Debtor with a notice of default. *Motion*, ¶8. Once again, the Debtor commenced a State Court action seeking declaratory and injunctive relief and monetary damages. *Id*. The State Court issued a *Yellowstone* injunction which tolled the Debtor's time to cure its alleged defaults and restrained the Landlord from taking steps to enforce the default during the pendency of this second litigation. *Id*. The Landlord counter-claimed for declaratory relief and attorneys' fees. *Id*. Thereafter, the Landlord moved for summary judgment dismissing the second litigation and declaring that the Debtor was immediately obligated to make the repairs.

The State Court, by decision dated February 24, 2005 (the "Diamond Decision"), dissolved the *Yellowstone* injunction and declared the Debtor obligated to make the repairs. *Motion*, ¶9. As of the date hereof, the repairs have not been made. *Transcript of August 8, 2007 Hearing*, p. 14, lines 19-25; p. 15, lines 1-4 (hereinafter cited as "*Tr.*, p. _, line _").

The Debtor failed to respond to the Diamond Decision, and on March 10, 2005, the Landlord gave notice to the Debtor that, by virtue of prior defaults and the passage of time, the Lease would terminate effective April 1, 2005. *Motion*, ¶10. The Debtor then moved by Order

4

to Show Cause for rehearing and reconsideration and simultaneously appealed the Diamond

Decision to the Appellate Division. *Id.* Notably, the appeal did not include a stay request. *Id.*

At the Appellate Division, the Landlord argued the appeal was moot because the Lease

had already terminated. *Motion*, ¶89. Although the Appellate Division granted the Debtor an

interim stay (the "Interim Stay") of the Diamond Decision, *Motion*, ¶89, the Appellate Division

explicitly did not resolve the mootness issue and instead gave the Landlord leave to address the

mootness issue on appeal. *Id.*

Meanwhile, as a result of the purported Lease termination, the Landlord asserted,

pursuant to Paragraph TWENTY-FOURTH of the Lease, that it was entitled to all of the Sub-

Lease proceeds as of March 31, 2005. *Motion*, ¶42.

On August 5, 2005, the Debtor filed for Chapter 11 protection. That same day, the

Debtor sought authorization to utilize the Lender's cash collateral (the "Cash Collateral").

*Motion*, ¶14. The Bankruptcy Court permitted the Debtor to use the Cash Collateral, subject to a

reservation of the Landlord's rights concerning, among other things, the termination of the Lease

and the pre-petition assignment of the Sub-Lease proceeds to the Landlord. *Id.* In substance, all

of the pre-petition litigation between the Debtor and the Landlord continued in the Chapter 11

case. *Id.*

**Litigation in the Chapter 11 Case**

Notwithstanding the Landlord's repeated assertion that the Lease had terminated in

Spring 2005, by motion dated January 31, 2006 (the "Assumption Motion"), the Debtor sought to

assume the Lease. *Motion*, ¶18. The Landlord objected, arguing that: (A) the Lease was not

capable of being assumed as it had previously terminated; and (B) even if the Lease remained

5

extant (i) significant monetary and non-monetary defaults existed under the Lease precluding assumption; and (ii) the Debtor's historical pattern of pernicious conduct (which included creating dangerous conditions at the Property and failing to remedy violations identified by the New York City Department of Housing) precluded the Debtor's assumption of the Lease. *Motion*, ¶22.

At the initial hearing on the Assumption Motion, the Bankruptcy Court requested supplemental briefing on whether the Lease existed. *Motion*, ¶19. At the continued hearing, the Bankruptcy Court made an initial, interlocutory holding that the Lease was capable of being assumed. *Motion*, ¶12. There has not been a final, dispositive ruling on the existence of the Lease; the District Court merely denied the Landlord leave to appeal the Bankruptcy Court's interlocutory order. *Id.*

By Motion dated January 22, 2007, the Landlord, later joined by the Lender, *Motion*, ¶23, sought the appointment of a Chapter 11 Trustee on the ground that Appellant repeatedly breached his fiduciary duties to the Debtor and its creditors and chronically disregarded the directions and orders of the Bankruptcy Court. *Motion*, ¶20. The Landlord also claimed that the Debtor repeatedly sought to delay, frustrate and impede the sale of the Lease because the potential sales would not have paid Equity in full. *Id.*

The Court concurred in the Landlord and the Lender's position and the Trustee was appointed on February 14, 2007. *Motion*, ¶24. Immediately upon being appointed, the Trustee discovered that tenant security deposits were missing, the insurance was inadequate and that the Property did not generate a positive cash flow. *Motion*, ¶30, n. 7.

**The Decision to Sell the Lease**

Given all that had gone on prior to his appointment, the Trustee believed the only way he could satisfy the needs of his various constituents was to market and sell the Lease through an open auction process at which anybody, including Equity, could bid. *Motion*, ¶¶26, 30. The Trustee believed he would be successful based on previous offers to purchase the Lease Appellant had disregarded because they would not provide a 100% distribution to Equity. *Motion*, ¶21.

To solicit the highest and best stalking horse offer, the Trustee directed his real estate broker to send each previously identified potential purchaser a copy of a proposed form of contract, as well as a cover letter setting forth the terms of the initial bidding procedures and advising all parties that the Lease would be sold at auction. *Motion*, ¶29.

In addition, the Trustee personally advised Appellant that he was welcome to, and in fact encouraged him to, bid on the Lease. *Motion*, ¶30. Appellant did not bid on the Lease.

The Trustee determined that the $16.2 million offer of Global Capital Holding L.L.C. ("Global") was the highest and best stalking horse offer. *Motion*, ¶31.

**Potential Obstacles to the Sale**

The Trustee prepared a motion (the "Sale Motion") setting forth a two-part sale process pursuant to which the Trustee would first obtain approval of his proposed bidding procedures and then, after having received approval, solicit bids for the Lease, conduct an auction of the Lease and then obtain Court-approval of the highest and best bid for the Lease. *Motion*, ¶45.

Most troubling to the Trustee was the Landlord's steadfast position that the Lease had terminated in Spring, 2005 and that the Trustee had nothing to assume or assign. The Landlord

7

made clear that it would continue to litigate this issue. *Motion*, ¶¶46, 48. If the Lease did not

exist, the Trustee would have nothing to sell, the case would be converted to a case under

Chapter 7 of the Bankruptcy Code and there would be no distribution to the Debtor's creditors.

The Landlord's position was bolstered by the Appellate Division's May 26, 2005 Order in

which the Appellate Division stayed Judge Diamond's Decision requiring the Debtor to make

certain repairs but which explicitly granted the Landlord leave to appeal the stay on the ground

that the Debtor's appeal had been rendered moot by the fact that the Lease had terminated prior

to the Debtor's appeal. *Motion*, ¶89.

**Calculation of Cure Amounts**

Cognizant of the fact that in order to sell the Lease the Trustee would have to satisfy the

requisite Bankruptcy Code Section 365 cure obligations, the Trustee turned his attention to the

cure obligations (both monetary and otherwise) due and owing to the Landlord and the Lender.

*Motion*, ¶33. Under the Bankruptcy Code, such cure obligations had to be satisfied before a sale

could take place.

The Landlord initially sought 100% of its legal fees totaling approximately $2 million

(the "Landlord Fee Cure"). Appellant argued repeatedly that the Bankruptcy Court had already

ruled that the Landlord's legal fees were, at most, $300,000. *Motion*, ¶36. Appellant was wrong.

The Bankruptcy Court had specifically stated that the $300,000 represented the minimum amount

the Court thought the Landlord was owed but was in no way a finding on the cure amount. *Tr.,*

p. 20, line 25; p. 21, lines 1-13.

Although based on Appellant's initial arguments, the Trustee originally questioned

whether the Landlord was entitled to the Landlord Fee Cure, in the end, the Trustee's

independent analysis supported most of the Landlord's contentions. *Tr.*, p. 28, lines 1-25. The Trustee spent weeks and weeks reviewing the entire State Court record and each of the Landlord and the Lender's time records. *Motio*n, ¶¶37, 41; Tr., p. 28, lines 23-25; p. 29, lines 1-3. In addition, the Trustee reviewed all of the applicable Lease provisions and case law. To determine if the Landlord and the Lender's legal fees (the "Fee Cure") were reasonable and compensable within the rubric of Section 365, the Trustee also analyzed the Ground Lease and the Debtor's mortgage and note (the "Mortgage and Note") with the Lender. *Motion*, ¶¶37-41; *Response*, ¶¶2-5. Because the time records could not be analyzed in a vacuum, the Trustee also analyzed the pleadings related to the underlying State Court litigations, the Sub-Lease dispute and all of the appellate litigation. *Tr.*, p. 28, lines 8-12. The Trustee also spent many hours discussing with the Landlord's counsel the nature of the time entries (to what endeavor they should be ascribed) and the basis for holding a significant portion of the entries as "cure costs" under Bankruptcy Code Section 365. *Motion*, ¶40.

The Trustee's analysis showed a pattern of obstruction and dereliction of duty on the part of Equity and continued attempts to preserve the value of the Lease on the part of the Landlord and the Lender. *Motion,* ¶¶61-99. Much of the legal work performed by the Landlord's attorneys was a direct result of the Debtor's misconduct and failure to perform its obligations under the Lease and the State Court Settlement. *Motion*, ¶¶76-79. The same was true for the Lender. *Response*, ¶3.

As a result of his detailed review and analysis, the Trustee concluded that Landlord Fee Cure incurred by the Landlord protecting its asset aggregated at least $1,940,662.42 through June 2007. *Motion*, ¶40. Similarly, the Trustee determined that the Lender was entitled to all of the

legal fees (the "Lender Fee Cure") it claimed. *Response*, ¶¶2, 4. Although the Trustee attempted to convince the Lender to compromise its legal fees, the Lender was not willing to do so. *Response*, ¶3.

The Landlord also sought $2 million in Sub-Lease proceeds (the "Sub-Lease Cure"). The Landlord remained firm in its assertion that pursuant to Paragraph TWENTY-FOURTH of the Ground Lease, as of April 1, 2005, the Landlord was owed all of the Sub-Lease proceeds. *Motion*, ¶42. According to the Landlord's interpretation of the Ground Lease, to cure the default and assign the Lease, the Trustee was obligated to pay for any default under the Lease <u>and</u> the Sub-Lease proceeds during the default period. *Id.* The Landlord estimated this amount at $2 million as of August 1, 2007. *Id.*

The Trustee researched this issue and concluded that the Landlord's position did not reflect the current state of the law because the language in the Lease reflected an unenforceable penalty provision. *Motion*, ¶43. The Landlord disagreed arguing that absent specific language stating that the Sub-Lease proceeds were security for amounts owed to the Landlord, the Sub-Lease proceeds constituted additional amounts owed to the Landlord. *Id.* Because the language in the Lease was both vague and unusual in the protections provided to the Landlord, there was no law directly on point. *Motion,* ¶44. Thus, the Trustee believed the Sub-Lease proceeds issue remained open for further litigation. *Id.*

Given the potential cure costs, and the amount of the Global offer (or any other offer the Trustee could reasonably presume he might realize), the Trustee determined that before he could sell the Lease he would have to negotiate a reduction of the monetary cure costs and address his cure obligations as they related to non-monetary cures, *i.e.*, the outstanding repairs. *Motion*, ¶48.

In addition, the Trustee determined that merely settling the Fee Cure would not meaningfully move the case towards an amicable and cost-efficient resolution. *Id*. The Landlord made clear that absent an all-encompassing settlement he would appeal the Lease's existence and the Sub-Lease proceeds. *Id*. Although the Trustee believed he would ultimately prevail, there was no guarantee that Global (or any other purchaser) would be willing to wait until the conclusion of the litigation to close on the Lease. *Id*. If the Landlord prevailed, the consequences to the Estate and its creditors would be disastrous. *Id*. Thus, the Trustee determined that there was a significant risk to the Estate if resolution was not reached with the Landlord. *Id*. Moreover, because the underlying issues of the viability of the Lease and the Sub-Lease proceeds directly impacted upon the Lender and its litigation against the Landlord, the Trustee determined that the Estate would best be served by a global resolution amongst the Estate, the Lender and the Landlord. *Id*.

The Trustee painstakingly negotiated nine iterations of the Settlement. The Trustee persuaded the Landlord to reduce the Landlord Fee Cure from $1.9 million to $1.7 million, waive its rights to all of the Sub-Lease proceeds, cease litigation against the Lender and agree that the Lease existed and was capable of being assumed and assigned. *Motion*, ¶¶2, 49, 104. In addition, the Landlord agreed that the entire $1.7 million was allocable to its legal fees and that it would receive no consideration for waiving its claims with respect to Lease termination or Sub-Lease proceeds. *Tr.,* p. 40, lines 11-22. The Lender, while not willing to compromise its legal fees, agreed to the existence of the Lease and to cessation of litigation with the Landlord. *Tr.*, p. 7, lines 3-6.

The Settlement ended years of extensive and expensive litigation between and among the

Debtor, the Lender and the Landlord.  The Settlement also put an end to the uncertainty surrounding the Lease's existence and allowed the Trustee to proceed with a sale that would satisfy the Debtor's creditors' claims.  *Motion*, ¶¶1, 2, 101, 102.

Notwithstanding the Settlement's obvious benefits to the Estate, Appellant objected to the Settlement.  Appellant's *Objection* was another self-serving, futile attempt to place Appellant's interests ahead of the Debtor's creditors.  Appellant never objected to the sale[4].

The Court overruled all of Appellant's objections and the Settlement was approved on August 9, 2007.

Appellant neither sought, nor obtained, a stay of the Settlement Order.


**<u>ARGUMENT</u>**

**I.**

**FAILURE TO OBTAIN A STAY OF THE SALE**
**OF THE GROUND LEASE OR INCLUDE**
**<u>PARTIES IN INTEREST RENDERS THIS APPEAL MOOT</u>**

The sale of the Lease closed on October 11, 2007.  At the closing, pursuant to the terms of the Settlement, the Landlord received $1.7 million and the Lender received $12,675,517.90.

Appellant never sought a stay of the Settlement Order or the sale order.  Accordingly, it would now be inequitable to reverse the Settlement Order.  *Kassover v. Gibson*, 2003 WL 21222341 *2 (S.D.N.Y. May 27, 2003).

---

[4]        Appellant might be deemed to have objected to the sale, in a somewhat back-handed manner, when he objected to the proposed bidding procedures by filing his own plan of liquidation and disclosure statement.  This objection was overruled as containing too many contingencies and being inferior to the auction proposed by the Trustee.

Mootness is governed by the five-factor analysis identified by the Second Circuit in *In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir. 1993). In *Chateaugay*, the Second Circuit identified five factors required to defeat a claim for mootness after a bankruptcy court order has been substantially carried out:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation in the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Kassover*, 2003 WL 21222341 at *2.

Each of the *Chateaugay* factors must be satisfied before a court can hold that the appeal is not moot. *Id. See also*, *Evergreen Int'l Airlines v. Pan Am Corp. (In re Pan Am)*, 1995 WL 366356 (S.D.N.Y. June 20, 1995) (court holds appeal moot after Bankruptcy Court's order authorizing interim distributions to the debtor's former employees is effectuated after appellant fails to obtain stay stopping distribution).

As in *Kassover* and *Pan Am*, Appellant fails to satisfy the *Chateaugay* factors: (i) this Court would be unable to fashion effective relief because the sale can not be unwound, the prerequisites of paragraph 4 and 14 of the Settlement having been satisfied[5]; (ii) reversal of the

---

[5]    Pursuant to the Settlement, the Landlord agreed that (a) once the Settlement was approved, (b) it received its stipulated cure amount and (c) the Repair Escrow was created, the Landlord would that the Ground Lease was in full force and effect and withdraw all claims that the Ground Lease had terminated. *Motion*, Exhibit A, ¶4. *See also Motion*, Exhibit A, ¶14 in which the Landlord's time to oppose the sale is extended only until August 31, 2007.

Settlement Order would create an unmanageable situation in that the Debtor and the Landlord would litigate the Fee Cure and the Sub-Lease Cure resulting in substantial, additional legal fees for the Estate; (iii) neither the Landlord nor the Lender has received notice of the appeal or any opportunity to participate in the proceeding; and (iv) Appellant had the opportunity to obtain a stay of the Settlement Order or a stay of the sale and chose not to avail itself of either opportunity.

For all of these reasons, any one of which would suffice, Appellant's appeal is moot and this Court must affirm the Settlement Order.

## II.

### THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION WHEN IT FOUND THE SETTLEMENT WITHIN THE RANGE OF REASONABLENESS

In ruling on the Settlement, the Bankruptcy Court was not required to "decide the numerous questions of law and fact raised by [objectors] but rather to canvas the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983), *cert denied* 464 U.S. 822 (1984). In order to determine if the Settlement falls within the range of reasonableness, the Supreme Court has instructed lower courts to consider:

(a)    The probabilities of success should the case go to trial versus the benefits of the settlement without the delay and expense of a trial and subsequent appeals;

(b)    The prospect of complex and protracted litigations if the settlement is not approved;

(c)    The proportion of class members who support the settlement;

(d)     The competency and experience of counsel who support the settlement;

(e)     The benefits believed to be received by the individuals or class; and

(f)     The extent to which the settlement is a product of arms length negotiating.

*In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988). Moreover, the Bankruptcy Court was not required to conduct a mini-trial on the merits. *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).

As the Bankruptcy Court made clear in its ruling at the Hearing, it considered the issues and facts before it and, after applying applicable law, determined that the Settlement fell within the range of reasonableness. As shown below, the Bankruptcy Court considered each of the *Texaco* factors and properly upheld the Trustee's judgment in each. Accordingly, the Settlement Order must be upheld.

**A.      The Probability of Success in the Various Litigations**
**         Compelled the Court to Find in Favor of the Settlement**

1.      Lease Litigation

Approval of the Settlement resolved the primary issue in this case: whether the Lease was terminated prepetition. At the time of the Settlement, that issue was ripe for determination by the New York State Supreme Court, Appellate Division. As set forth above, although the Appellate Division granted the Debtor an Interim Stay of the Diamond Decision, the Appellate Division also gave the Landlord "leave to address the issue of mootness on the appeal." *Motion,*¶89. Although the Trustee believed he would prevail in the Appellate Division, he also believed there was a possibility he could lose and the Appellate Division would declare the Lease terminated. If that happened, the Trustee would have no asset to sell and the Lender and the

Debtor's other creditors would receive nothing.

Judge Drain gave credence to this analysis:

> [t]he first issue, the issue of pre-petition termination, was one that I decided as a threshold matter before considering the issues raised by the debtor. ... I concluded that it had not been fully terminated or, perhaps better stated, that the debtor still maintained an interest in the lease. That issue is one that is still subject to appeal. An interlocutory appeal was denied, but that threshold issue is one that I recognize a different court could view differently.

*Tr.*, pp. 39-40. The Bankruptcy Court's determination was made after hearing oral argument on that issue and reviewing additional submissions related thereto. Approval of the Settlement resolved this keystone issue at no cost to the Estate. *Tr.*, p. 40, lines 11-13. Thus, given the possibility that the Trustee might lose, approval of the Settlement was within the range of reasonableness.

2.     Sub-Lease Litigation

After reviewing the Trustee's Motion, which delineated the specific Lease provision pursuant to which the Landlord asserted its entitlement to all the Sub-Lease proceeds, as well as the applicable law, the Court stated that the Landlord's position with respect to the Sub–Lease proceeds was "less meritorious" than the Landlord's position on Lease termination, but that "there [was] at least some risk that the Landlord would win." *Tr.*, p. 40, lines 23-25; p. 41, lines 1-5. Given the recognized potential for a loss and the fact that if the Trustee lost, the Sub-Lease Cure costs would render the Lease impossible to sell in the current financial market, the Court did not abuse its discretion in finding that the Settlement was in the range of reasonableness.

3.     Fee Litigation

The final litigable issue addressed in the Settlement was the amount of the Fee Cure.

Based on his analysis, the Trustee believed that the Landlord and Lender were entitled to most, if not all, of the fees they sought. The Trustee based his determination on the explicit provisions in the Lease, the Mortgage and Note, and the cash collateral documents, as well as the framework provided by the Bankruptcy Court in this case, decisions in other jurisdictions and the Supreme Court's *Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Electric*, 127 S.Ct. 1199 (2007). *Motion,* ¶¶39, 42, 64, 73, 84, 85, 88, 89; *Response*, ¶¶2, 3.

Recovery of attorneys' fees under Bankruptcy Code Section 365 is appropriate where the lease at issue provides that such recovery is an obligation of the debtor. *Urban Retail Properties v. Loews Cineplex Entertainment Corp.*, 2002 WL 535479, *9 (S.D.N.Y. Apr. 9, 2002); *In re Crown Books Corp.*, 269 B.R. 12, 15 (Bankr. D. Del. 2001); *In re Child World, Inc.,* 161 B.R. 349, 353 (Bankr. S.D.N.Y. 1993); *In re Best Products Co., Inc.*, 148 B.R. 413, 414 (Bankr. S.D.N.Y. 1992). The recovery is not absolute; it must also be reasonable. *In re Nicfur-Cruz Realty Corp.*, 50 B.R. 162 (Bankr. S.D.N.Y. 1985). As explained by Bankruptcy Judge Beatty, reasonable attorneys' fees are those that are necessary to accomplish the end sought. *Id.* at 167. In the *Nicfur-Cruz* case, the Bankruptcy Court found that a mortgagee's preservation of the value of his interest in the debtor's asset by securing adequate protection payments from the debtor and monitoring and participating in the Chapter 11 case was compensable. *Id.* at 168. The Bankruptcy Court further held that it was reasonable to require a debtor to reimburse attorneys' fees incurred by a creditor when such fees were cost-justified by the economics of the situation or necessary to the preservation of the creditor's interest in light of the legal issues involved. *Id.* at 169. In the instant case, the Landlord's efforts were expressly authorized by the Lease. Moreover, the Landlord was acting to preserve and protect the value of its $16.2 million asset.

17

The Trustee received additional guidance in determining how much of the Fee Cure was compensable from the *Crown Books* decision. In *Crown Books*, the court was asked to determine if the fees a landlord sought pursuant to explicit lease provisions were reasonable. To determine reasonableness, *Crown Books* instructed, a court must consider: "(1) the amount of the dispute relative to the attorneys' fee requested, (2) the Debtor's good faith effort to estimate and resolve the cure claim, (3) the Debtor's compliance with the Code, and (4) whether the issue is a matter of first impression." *In re Crown Books*, 269 B.R. at 19.

Application of the *Crown Books* factors demonstrate that the Landlord and the Lender's fees were reasonable. First and foremost, the majority of the fees incurred by the Landlord were caused by Appellant's improvident litigation strategy; the Debtor created the cure costs. Moreover, Appellant has repeatedly, albeit falsely, asserted that the Landlord's fees were capped at $300,000 by the Bankruptcy Court. In addition, the amount at issue, $1.9 million, represents only 12% of the value of the leasehold interest the Landlord was protecting. Third, the Debtor repeatedly failed to follow the directives of the Bankruptcy Court and the State Court. Based on this, the Trustee believed that the Landlord's (and the Lender's) fees were reasonable.

The Court affirmed this analysis at the Hearing:

> Frankly, and particularly given the extremely hard-fought defense by [the Landlord] of discovery of those legal fees, I approached this issue initially as I think the trustee said he did, which is that they must be lower than what the landlord is claiming. However, I have listened carefully to Mr. Kittay. I've gone back also and reviewed the provisions of the lease, and I've carefully reviewed his application.
>
> And it seems to me that there is a sound and valid basis, first, for the amount of the legal fees claimed by [the Landlord]. These were not fees that were simply pulled out of the air, but I am satisfied are supported by appropriate time records and were actually incurred.

18

> Secondly, while I recognize that there are issues pertaining to whether the provisions of the lease actually cover all of the fees incurred, I also believe that the lease is quite broadly written in respect of the landlord's right to legal fees; and, moreover, I note that there has been a discount on those fees.
>
> Finally, while I don't believe that the recent Supreme Court ruling in the PG&E case is as clear-cut as [the Landlord] does, I believe it at a minimum would raise an issue for future litigation as to how much, if at all, there can be a, quote, "bankruptcy gloss" on pre-petition attorneys' fees, or attorneys' fees that a creditor would be entitled to as a result of the pre-petition agreement.

*Tr.*, p. 41, lines 22-25; p. 42, lines 1-22.

With respect to the Lender's attorneys' fees, the Bankruptcy Court stated:

> The only issue that required some discretion and analysis, I believe, on behalf of the trustee is the issue of the amount of the bank's allowable fees under Section 506(b) of the Bankruptcy Code. It appears to be clear, given the pending offer for the lease that secures the bank's claim that the bank is over-secured and, therefore, would be entitled to post-petition interest and fees. The debtor, as part of the cash collateral stipulation, agreed that the bank was entitled to fees. So the analysis would go to the amount of the fees required. And I believe that this trustee and his professionals, who in my experience are diligent and, frankly, aggressive generally in pursuing the estate's interests, properly did their job in performing due diligence on the bank's fees. Therefore, the settlement with the bank is reasonable.

*Tr.*, p. 38, lines 10-24.

Thus, the Trustee correctly determined that it was likely that both the Landlord and the Lender would be victorious if the Trustee litigated the Fee Cure.

Thus, viewed in its entirety, the Settlement precluded fee litigation which the Trustee would have lost and avoided, at no cost to the Estate, potentially devastating litigation related to Lease termination and Sub-Lease proceeds.

For all of these reasons, the Settlement was within the range of reasonableness and the Settlement Order must be affirmed.

19

**B.      The Complexity of the Litigation, and the Expense, Inconvenience**
<u>**         and Delay It Would Occasion Supported Finding in Favor of the Settlement**</u>

As the record reflects, litigation regarding the Lease commenced almost five years ago

and has continued throughout this bankruptcy case.  As noted by the Bankruptcy Court:

> [T]his entire bankruptcy is an outgrowth over a dispute over a relatively modest
> amount of repairs that were not made.  And by "relatively modest," it appears to
> me that it's somewhere between $15,000 and $75,000.  At least that's what it was
> at the time.

> However, it was a dispute, and it was litigated extensively.  The repairs were not
> made.

*Tr.,* p. 43, lines 1-7.  As set forth above and in the Trustee's Motion, absent the Settlement, the

Landlord was prepared to litigate the Lease termination issue to the very end.  Based on the

rancourous litigation history in this case, the Trustee correctly believed litigating the existence of

the Lease would take a considerable amount of time, cost significant money, cause substantial

delay, and quite likely eliminate the possibility of any potential sale of the Lease.

Although New York law holds that penalty provisions labeled as "assignment of rent"

provisions are unenforceable, the language in Paragraph TWENTY-FOURTH of the Lease is

vague and unclear.  Specifically, although the Lease does not state that the assignment of rent is

for security or as additional security, the Lease also does not say that the assignment of rent is to

be paid in addition to the cure amount.  Moreover, the parties' litigation positions have not been

fully developed.  Thus, litigation of the Sub-Lease Cure would be expensive and would take

considerable time.  Moreover, had the Trustee been forced to litigate this issue he would not have

been able to sell the Lease until the conclusion of the litigation because he would not have known

how much the Landlord was owed in cure costs.  The delay would have been significant and

could have created disastrous results for this Estate.

Finally, as set forth above, the inherent difficulty in litigating the Fee Cure is that, pursuant to the documents the Debtor executed, the Debtor was obligated to pay most, if not all, of the fees. While not overly complex, the litigation would be an unnecessary expense that would only serve to make a sale more difficult.

For all of these reasons, the nature and expense of litigation argued in favor of upholding the Settlement and the Bankruptcy Court was correct in finding the Settlement within the range of reasonableness. Accordingly, the Settlement Order must be affirmed.

## C.    **The Vast Majority of the Debtor's Creditors Supported the Settlement**

As set forth in the Motion at paragraph 103, the Lender, the Debtor's largest creditor, urged the Trustee to proceed with the sale which it saw as its best opportunity to get paid, in full, in a "timely" fashion. Moreover, in response to the Appellant's Objection, the Lender advised the Trustee that it would object to the Debtor's proposed plan and fight confirmation not only because it thought the sale was its best opportunity to be paid, but also because it wanted to be guaranteed prompt payment and to be done with Appellant and unnecessary and expensive litigation. *Motion*, ¶47.

The Trustee's responsibility lies first and foremost to the creditors, not the Debtor's defalcating principals. Nonetheless, the Trustee did consider the views of Equity. The Trustee's counsel met with Appellant's representatives and explained that Appellant was able to bid on the Lease on the same terms and conditions as every other potential purchaser. *Motion*, ¶30. Moreover, given that surplus would return to Equity, the Trustee's counsel explained that the Appellant was actually in a superior position when it came to bidding. *Motion*, ¶30.

21

Having considered the views of all his constituents, the Trustee properly determined to enter into the Settlement, the Bankruptcy Court properly found this reasonable and the Settlement Order must be upheld.

**D**.    **The Benefits Received by the Classes Support Approval of the Settlement**

As set forth in paragraph 1 of the Motion at, paragraph 14 of the Response and pages 10 and 11of the Hearing transcript, approval of the Settlement allowed the Trustee to sell the Lease for an amount sufficient to satisfy, in full, the claims of the Lender, the compromised claims of the Landlord and provide a significant distribution to unsecured creditors.  Appellant's ability to receive, or not receive, a distribution is attributable solely to his pernicious conduct and his pattern of litigious behavior – including this appeal.  If the Settlement had not been approved, the Trustee would have been required to litigate the Fee Cure, the Sub-Lease Cure and the existence of the Lease and the costs of those disputes would have made it unlikely that Equity would receive a distribution.

Based on the foregoing, the benefits received by the classes support approval of the Settlement and, accordingly, the Settlement Order must be upheld.

**E**.    **The Settlement Was Negotiated by Able Counsel Working at Arms' Length**

Each of the Landlord, the Lender and the Trustee were represented by able counsel who worked many, many hours negotiating many different versions of the Settlement.  *Motion*, ¶105. Although Appellant seeks to paint a picture of repeated, and inappropriate, capitulation by the Trustee, the terms of the Settlement illustrate a dramatically different result.  The Settlement resulted in a  62% reduction of the potential Landlord cure amount.  *Motion*, ¶1.  The Lender insisted upon the full value of its legal fees, but waived the right to assert that the Lease had

terminated, an otherwise major impediment to a sale of the Lease. As set forth above, for these reasons, the Settlement was within the range of reasonableness and the Bankruptcy Court was correct in entering the Settlement Order.

F.     **The Nature and Breadth of the Releases**
       **Were Appropriate and Support the Settlement**

Given the unique circumstances of the case and the substantial consideration provided by the Lender and the Landlord, namely an acknowledgment that the Lease existed and was capable of being assumed, the releases given to the Landlord and the Lender, as well as the indemnification provisions, were also appropriate. *See Metromedia Fiber Network*, 416 F.3d 136 (2d Cir. 2005). Accordingly, the Bankruptcy Court was correct in its findings and the Settlement Order must be upheld.

G.     **The Record Amply Supported the Settlement**

The record before the Bankruptcy Court, and this Court, supports the Bankruptcy Court's decision that the Settlement Order was within the range of reasonableness. Appellant's brief is rife with misstatements, including its contentions, in paragraph 95 of its brief, that the record was inadequate to support the Settlement. Contrary to Appellant's arguments about the facts, the record shows that:

- The Trustee examined the Lender's claims. *Response*, ¶¶2-4;

- The release and indemnification provision given to the Lender were in exchange for valid consideration. *Response*, ¶¶11-13; *Tr.*, p. 5, lines 5-25; p. 6, line 15; p. 7, lines 3-5; p. 8, lines 13-17;

- The Trustee analyzed the implications of the *ipso facto* termination clause and concluded that the Landlord was not claiming under such provision. *Response*, ¶8;

- The Trustee analyzed the Lease provisions on attorneys' fees for lease termination.  *Motion*, ¶¶39, 41, 69-72, 77-82;

- The Trustee analyzed all of the applicable Lease provisions and the work performed to distinguish between compensable and non-compensable time.  *Motion*, ¶61; *Response*, ¶10;

- The Trustee analyzed the fee arrangement between the Landlord and its counsel including the presence of a retainer agreement and concluded a written agreement was not necessary.  *Response*, ¶16; *see also* Title 22 Official Compilation of Codes, Rules and Regulations of the State of New York, Section 1215.2(2);

- The Trustee analyzed the record of the case in light of the amount at stake relative to the fees incurred.  *Response*, ¶¶4, 10; *Tr.*, p. 34, lines 20-25;

- The Trustee analyzed the total fees paid to the Landlord's attorneys.  *Motion*, ¶40;

- The Trustee obtained an accounting for the $350,000 paid pursuant to the Appellate Division Order.  *Response*, ¶16; *Tr.*, p. 11, lines 5-25; p. 12, lines 1-19; p. 30, lines 12-23;

- The Trustee obtained an accounting of the escrow funds maintained by the Landlord for the Debtor.  *Response*, ¶16; *Tr.*, p. 11, lines 21-25; p. 12, lines 1-19; p. 30, lines 2-23; and

- The Trustee examined the entire history of the litigation between the Debtor and the Landlord, including the interlocutory appeal to the District Court.  *Motion*, ¶¶19, 34; *Response*, ¶16.

The record was complete and provided the Bankruptcy Court with the ability to canvass the issues and correctly decide the Settlement was within the range of reasonableness.

Accordingly, the Settlement Order must affirmed.

**CONCLUSION**

For all of the reasons set forth above, the Settlement Order should be affirmed and

upheld.

Dated:  Tarrytown, New York
        November 13, 2007

                                        KITTAY & GERSHFELD, P.C.
                                        Attorneys for the Trustee

                                         /s/ David R. Kittay
                                        David R. Kittay (DK 0481)
                                        100 White Plains Road
                                        Tarrytown, New York 10591
                                        (914) 332-8000

25