UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

In re EAST 44TH REALTY, LLC,                                   05 Br. 16167 (RDD)

     Debtor.

_____x

JOSEF BILDIRICI,                                                   07 Civ. 8799 (CM)

     Appellant,

     -against-

DAVID R. KITTAY, as CHAPTER 11 TRUSTEE
FOR EAST 44TH REALTY, LLC,

     Appellee.

_____x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1|23|08

## DECISION AND ORDER AFFIRMING THE DECISION
## OF THE BANKRUPTCY COURT

McMahon, J.:

     Before this Court is an appeal from the decision and order of the United States

Bankruptcy Court for the Southern District of New York (Drain, J.) approving the settlement

agreement (the "Settlement") negotiated by David R. Kittay (the "Trustee") – as Chapter 11

Trustee for East 44th Realty, LLC (the "Debtor") – entered into by and among the Debtor, East

Forty-Fourth Street, L.L.C. (the "Landlord"), and New York Community Bank (the "Lender").

The Bankruptcy Court's application of Rule 9019's standard for evaluating a settlement is

reviewed for abuse of discretion. The Bankruptcy Court did not abuse its discretion when –

applying the relevant factors – it found the Settlement within the range of reasonableness. The

record amply supports the Bankruptcy Court's conclusion. Accordingly, this Court affirms the

Bankruptcy Court's decision and order approving the Settlement.

## Statement of the Case

On August 9, 2007, the Bankruptcy Court entered an order (the "Settlement Order") approving the Settlement between the Debtor, the Landlord, and the Lender. The Settlement removed the cloud on the Debtor's sole asset (a ground lease and related sub-leases), settled the amount of cure costs owed to the Landlord, and allowed the Trustee to satisfy his cure obligations under Section 365 of the Bankruptcy Code, 11 U.S.C. § 365, and "sell" the lease.[1] As a result of the Settlement, the lease was sold, and the Landlord's and the Lender's claims were satisfied. The Trustee anticipates a significant distribution to the Debtor's creditors, and a possible distribution to the Debtor's equity holders (which includes appellant).

The Bankruptcy Court issued the Settlement Order after considering: the Trustee's motion to approve the settlement ("the Motion")[2]; appellant's Objection to Cure Claim (the "Objection"); the Trustee's Response to Objection to Cure Claim (the "Response" or "Response to Objection"); and the arguments made at a hearing on the Motion on August 8, 2007 (the "Hearing"). Judge Drain, from the bench, delivered an opinion which: addressed the Trustee's diligence in reviewing the Lender's and the Landlord's attorneys' time records and found the attorneys' fees reasonable; recognized that the otherwise unresolved lease termination issue

---

[1] The word "sell" is used as shorthand— in actuality, the lease was assumed and assigned pursuant to Section 365 of the Bankruptcy Code.

[2] The motion referred to is the Trustee's Motion Pursuant to Federal Rules of Bankruptcy Procedure 9019(a) Seeking Approval of Global Stipulation Between and Among David R. Kittay, Chapter 11 Trustee for Debtor, New York Community Bank and East Forty-Fourth Street L.L.C., dated July 27, 2007.

2

would cloud the sale of the lease; acknowledged the sub-lease proceeds issue and considered the risks of litigating that issue; found that the Debtor had failed to make certain repairs in 2003, and that, as a result, the Landlord had the right to pursue its remedies under the lease; and concluded that the releases and indemnity provisions contained in the settlement were appropriate.

Mr. Bildirici (the Debtor's principal) appeals from the decision of the Bankruptcy Court. Specifically, appellant argues that the Trustee's analysis of the Landlord's and the Lender's attorneys' fees was inadequate, that the Settlement provides for an excessive distribution to the Landlord and/or the Lender, and that the Bankruptcy Court erred in finding that the Settlement constituted a business judgment by the Trustee that rose above the lowest level of reasonableness.

## Statement of Facts

### *Pre-Petition Events*

The Debtor's only asset in this case was a claim to rights as a tenant under a ground lease to real property located on East 44th Street in New York, New York. The Debtor also had corresponding rights as a sub-lessor to "space leases" (the sub-leases and the ground lease are collectively referred to herein as the "Lease").

In December 2002, the pre-petition Debtor took an assignment of the Lease. Because the assignor had failed to repair the property as required under the Lease, the Landlord refused to consent to the assignment and served a notice of default on the Debtor and the assignor for breach of the contractual obligation to make necessary repairs. In response, the Debtor commenced an action in New York State Supreme Court seeking, among other things, a

3

declaration that there had been no breach of the Lease. The Debtor also sought – and obtained – a *Yellowstone* injunction restraining the Landlord from terminating the Lease during the pendency of the state court action.

In May 2003, the Landlord and the Debtor resolved the litigation pursuant to a settlement agreement, which required the Debtor to rectify all of the previously noted repairs and to have any additional work performed that the Landlord's engineer believed necessary. The state court settlement also precluded the Debtor from contesting that repair work was not required, and afforded the Landlord the opportunity to enforce its rights under the Lease if the Debtor failed to cure deficiencies that had previously been identified as needing repair.

In November 2003, a compliance inspection revealed that various previously identified deficiencies had not been corrected. Notwithstanding the state court settlement, the Debtor refused to make certain repairs. In July 2004, the Landlord served the Debtor with a notice of default, and, once again, the Debtor commenced an action in state court seeking declaratory and injunctive relief and money damages. Again, the state court issued a *Yellowstone* injunction, which tolled the Debtor's time to cure its alleged defaults and restrained the Landlord from taking steps to enforce the default during the pendency of this second litigation. The Landlord counter-claimed for declaratory relief and attorneys' fees, and moved for summary judgment dismissing the second litigation, as well as a declaration that the Debtor was immediately obligated to make the repairs.

On February 24, 2005, the state court issued a decision dissolving the *Yellowstone* injunction and declaring the Debtor obligated to make the repairs. Two weeks later, after the Debtor had failed to respond to the court's decision, the Landlord gave notice to the Debtor that,

4

by virtue of prior defaults and the passage of time, the Lease would terminate effective April 1,

2005. The Debtor then moved for rehearing and reconsideration of the state court decision, a

motion which the Landlord successfully opposed. The Debtor simultaneously appealed the state

court decision to the Appellate Division, but did not seek a stay.

The Landlord argued that the appeal was moot because the Lease had already terminated

as of April 1, 2005. The Appellate Division granted an interim stay of the lower court decision,

but did not resolve the mootness issue, instead granting the Landlord leave to address mootness

on appeal. The Landlord also asserted that under the Lease, as a result of the purported

termination, it was entitled to all of the sub-lease proceeds as of March 31, 2005.[3]

On August 5, 2005, the Debtor filed for Chapter 11 protection. Although the filing of

bankruptcy stayed all pre-petition state court litigation between the Debtor and the Landlord, the

substance of the underlying issues continued to be litigated in the context of the bankruptcy case.

***The Chapter 11 Case***

On January 31, 2006, the Debtor moved to assume the Lease (the "Assumption Motion"),

notwithstanding the Landlord's assertions that the Lease had terminated as of April 1, 2005. The

Landlord objected to the Assumption Motion, arguing that the Lease was not capable of being

assumed since it had already terminated, and, in the alternative, that even if the Lease had not

terminated, the significant monetary and non-monetary defaults which existed under the Lease

precluded assumption by the Debtor.

At the initial hearing on the Assumption Motion, the Bankruptcy Court requested

---

[3] The issue of whether the Lease had, in fact, terminated was still disputed by the parties at the time the Settlement was submitted to the Bankruptcy Court for approval. (*See* Motion ¶ 11.)

5

supplemental briefing on the issue of whether the Lease had been terminated. At the continued

hearing in March 2006, the court ruled that the Lease had not terminated and was capable of

being assumed. The Landlord sought an interlocutory appeal of this ruling on the lease

termination issue, but the district court dismissed the appeal, finding that the standards for an

interlocutory appeal had not been met. Thus, there has not been a final, dispositive ruling on the

existence of the Lease, because this issue has not been addressed by an appellate court.[4]

In January 2007, the Landlord sought the appointment of a Chapter 11 Trustee to sell the

Property and distribute the proceeds (the "Trustee Motion"), on the ground that appellant

(Debtor's principal) repeatedly breached his fiduciary duties to the Debtor and its creditors and

chronically disregarded the directions and orders of the Bankruptcy Court. (Motion ¶ 20.) The

Landlord also asserted that the Debtor repeatedly impeded resolution of the sale of the Property

because any proposed sale would not pay equity in full on its investment in the Lease. (Id.) The

Lender later joined the Trustee Motion in the hope that the appointment of a trustee would put an

end to the litigation, prevent additional costs, and provide a means to have the Lender's claim

satisfied. (Id. ¶ 23) Although the Debtor initially opposed the Trustee Motion, it ultimately

consented to the requested relief. The Bankruptcy Court concurred with the Landlord and the

Lender, and on February 14, 2007, it entered an order directing the appointment of a Chapter 11

trustee with all of the powers and duties arising under Section 1104(a) of the Bankruptcy Code.

***The Sale of the Lease***

In light of the litigation that had ensued in the state court and the Bankruptcy Court, the

---

[4] Absent the Settlement, the Landlord would have raised this issue in conjunction with
any assumption or assignment of the Lease. (Motion ¶ 19.)

Trustee met with all interested parties to ascertain the best course of action for the Debtor, its

creditors, and the estate.  Their respective positions were as follows: the Landlord asserted that

the Lease had terminated in Spring 2005 (and, thus, the Trustee had nothing to assume or sell),

and that, in any event, no one would be interested in buying the Lease because the Landlord was

entitled to all of the Space Lease proceeds, resulting in astronomical cure amounts; Debtor's

principal (appellant) insisted that the Lease still existed and that sale could not go forward unless

equity would recover a substantial amount of its investment, or, alternatively, that equity should

be allowed to assume the Lease; and the Lender stated that its goals was to sell the Lease as soon

as possible so that its claim would be satisfied in full.  (Motion ¶ 25.)

Given these divergent views, the Trustee made the business judgment that the best way to

satisfy the needs of his various constituents was to market and sell the Lease through an open

auction process.[5]  The Trustee set forth a two-part sales process by which the Trustee would first

obtain approval of the bidding procedures, and then, after having received approval, would solicit

bids for the Lease, conduct an auction, and obtain the Bankruptcy Court's approval of the highest

bid.  On July 10, 2007, the Bankruptcy Court approved the bidding procedures for the sale of the

Lease.

After taking steps to solicit the highest and best offers, the Trustee reviewed the four

timely submitted bids and determined that the $16.2 million offer of Global Capital Holding

L.L.C. ("Global") was the highest and best stalking horse offer.  (Motion ¶ 31.)

---

[5] The open auction process provided an opportunity for anyone – including the Debtor's
equity holders – to bid on the Lease.  Although the Trustee encouraged appellant to bid on the
Lease, he did not do so.

7

## *Cure Obligations*

In order to sell the Lease, the Trustee would first have to satisfy the requisite cure

obligations (both monetary and otherwise) due and owing to the Landlord and the Lender, as is

required under section 365 of the Bankruptcy Code. The Landlord initially sought 100% of its

legal fees. In its objection to the Assumption Motion, the Landlord stated that its aggregate cure

costs were at least $2 million. Appellant argued repeatedly that the Bankruptcy Court had ruled

that the Landlord's legal fees were, at most, $300,000. In fact, the Bankruptcy Court had

specifically stated that $300,000 was "not a ruling on cure costs," but was the "absolute

minimum amount" the Landlord was owed, and, thus, was the amount the Debtor would have to

escrow for cure costs if it wished to proceed on its Assumption Motion. (05-BR-16167, Dkt.

#294, August 8, 2007 Hearing Transcript ("Tr.") at 21.)

Based on appellant's initial arguments, the Trustee was unsure whether the Landlord was

entitled to the entire fee cure amount. However, after an independent analysis reviewing the

Landlord's time records, the prior litigations, the applicable Lease provisions and case law, and

other relevant documents – in addition to discussing with Landlord's counsel the nature of the

time entries and the basis for categorizing certain entries as "cure costs" under Bankruptcy Code

section 365 – the Trustee determined that the Landlord fee cure was reasonable. The Trustee

concluded that the legal fees incurred by the Landlord protecting its asset were at least

$1,940,662.42 through June 2007. The Trustee's analysis indicated that much of the legal work

performed by the Landlord's attorneys was a result of the Debtor's failure to perform its

obligations under the Lease and the state court settlement.

Similarly, the Trustee determined that the legal fees claimed by the Lender were

8

reasonable. The Trustee attempted to convince the Lender to reduce its fees, but the Lender refused on the ground that it was entitled to recover in full. Although the Lender's legal fees were high, the Trustee determined that they were reasonable within the scope of work performed and the value of the asset being preserved. Moreover, the Debtor explicitly consented to the payment of the Lender's fees and expenses under the second interim stipulation authorizing the use of cash collateral, which was "so ordered" by the Bankruptcy Court on September 30, 2005. (Response to Objection ¶¶ 3-4.)

The Landlord also insisted that under Paragraph TWENTY-FOURTH of the ground lease, the Landlord was owed all of the sub-lease proceeds as of April 1, 2005, which the Landlord estimated to be $2 million. The Landlord asserted that in order to cure the default and assign the Lease, the Trustee was obligated to pay for any default under the Lease *and* the sub-lease proceeds during the default period. After researching this issue, the Trustee concluded that the Landlord's position did not reflect the current state of the law because the aforesaid paragraph reflected an unenforceable penalty provision. However, because the Trustee believed that language in the Lease was both vague and unusual in the protections it provided to the Landlord, there was no law directly on point and the Trustee determined that reasonable people could disagree about the correct interpretation. Accordingly, the Trustee believed that the sub-lease proceeds issue remained open for further litigation, which would be uncertain and expensive, and would further delay any resolution.

The Landlord made clear that absent an all-encompassing settlement, the Landlord would appeal the Lease's existence and the issue of the sub-lease proceeds. Although the Trustee believed the Landlord would not ultimately prevail on these issues, there was no assurance that

9

Global (or any other purchaser) would be willing to wait until the conclusion of the litigation to close on the Lease. And if the Landlord prevailed, the consequences to the estate and its creditors would be drastic. Thus, the Trustee determined that there was a significant risk to the estate if a resolution was not reached with the Landlord. Moreover, because these issues affected the Lender's litigation against the Landlord, the Trustee determined that the estate would benefit most from a global resolution among the estate, the Landlord, and the Lender.

After many rounds of negotiation, the parties entered into a form of global stipulation and mutual releases which resolved all of the issues between the Trustee and the Landlord, the Landlord and the Lender, and the Lender and the Trustee. The stipulation included, *inter alia*, the following: the Landlord agreed to reduce its fee cure to $1.7 million, waive its rights to all of the sub-lease proceeds, cease litigation against the Lender, and agree that the Lease had not terminated and was capable of being assumed and assigned; the Landlord agreed that the entire $1.7 million was allocable to its legal fees and that it would receive no consideration for waiving its claims regarding Lease termination or the sub-lease proceeds; the Lender agreed to the existence of the Lease and to cease litigation with the Landlord, although the Lender would not compromise its legal fees; the Trustee waived its claims against the Landlord; the Landlord waived its claims against the estate; the Lender and Landlord mutually released each other from any claims arising from the Lender Litigation; and the Trustee would pay the Lender in full satisfaction of the Lender's claim against the estate.

The Settlement ended years of rancorous and expensive litigation between and among the Debtor, the Lender, and the Landlord, and it allowed the Trustee to proceed with a sale that would satisfy the claims of the Debtor's creditors. Nevertheless, appellant objected to the

10

Settlement. The Bankruptcy Court overruled all of appellants' objections, and entered an order approving the Settlement on August 9, 2007. Appellant never sought, nor obtained, a stay of the Settlement Order.

The sale of the Lease closed on October 11, 2007. Pursuant to the terms of the Settlement, the Landlord received $1.7 million and the Lender received $12,675,517.90.


## Standard of Review

A bankruptcy court's finding pursuant to Rule 9019 that a settlement is reasonable is reviewed for abuse of discretion. *See, e.g.,* In re Delta Airlines, Inc., 374 B.R. 516, 522 (S.D.N.Y. 2007). A bankruptcy court will have abused its discretion if "no reasonable [person] could agree with the decision" to approve the settlement. Delta, 374 B.R. at 522 (quoting In re Frost Bros., Inc., 1992 WL 373488, at *4 (S.D.N.Y. Dec. 2, 1992) (internal quotation marks omitted)).


## Analysis

### *Mootness of the Appeal*

On August 9, 2007, the Bankruptcy Court issued orders approving the Settlement and authorizing the sale of the Lease. Appellant never sought a stay of either order. Two months later, on October 11, 2007, the sale of the Lease closed.

The Trustee argues that this appeal is moot under the law of this Circuit, and that it would now be inequitable to disturb the Settlement. The Trustee is correct.

The Second Circuit has repeatedly stated that in bankruptcy cases, "'[a]n appeal should ...

be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005) (quoting In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir.1993) ("Chateaugay I")); *see also* Delta, 374 B.R. at 522. A bankruptcy appeal may be equitably moot in two situations: when an unstayed order has resulted in a "comprehensive change in circumstances," or when a reorganization is "substantially consummated." Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y.1994) (quoting Chateaugay I, 988 F.2d at 325, and In re Chateaugay Corp., 10 F.3d 944, 952 (2d Cir.1993) ("Chateaugay II" )).

The Second Circuit has identified five factors, each of which must be satisfied to defeat a claim of mootness after a bankruptcy order has been substantially carried out:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation in the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

Chateaugay II, 10 F.3d at 952-53 (citations and internal quotations omitted). Courts have found that the same Chateaugay factors are instructive in the context of a "comprehensive change of circumstances." Delta, 374 B.R. at 523 (citing, e.g., Kassover v. Gibson, 2003 WL 21222341, at *2 (S.D.N.Y. May 27, 2003), *aff'd*, 98 Fed. App'x 30 (2d Cir.2004)). In his brief, appellant does not contend that he sought a stay of the Settlement or sale orders pending appeal. As such, appellant must overcome a strong presumption that his appeal has been rendered moot. *See, e.g.,*

12

Metromedia, 416 F.3d at 145.

Mr. Bildirici contends that his appeal – which challenges the fees and releases contained in the Settlement – only seeks to reverse the Settlement Order, and that it does not in any way challenge the Sale Order. He claims that this appeal only affects the distribution of the sale proceeds, and that the Settlement provides for an excessive distribution to the Landlord and/or the Lender, some of which could be returned to the Trustee. In an attempt to distinguish Chateaugay (or perhaps in an effort to satisfy it), Mr. Bildirici argues that the court could "easily order effective relief . . . by simply ordering the Landlord and/or the Lender to disgorge the amounts paid under the settlement." (Appellant Reply at ¶ 3.)

The Settlement that was submitted to, and approved by, the Bankruptcy Court embodied a carefully negotiated bargain struck by the Trustee, the Landlord, and the Lender. The flaw in appellant's argument is that any disgorgement of fees that were negotiated as part of the Settlement would alter the bargain, and, as a result, would disrupt the equipoise that produced the Settlement in the first place. And without the Settlement, the sale of the Lease would not have occurred. I reject the notion, as have other courts, that a painstakingly-negotiated bargain should simply be altered in circumstances like this. *Cf.* In re Speciality Equip. Cos., 3 F.3d 1043, 1049 (7th Cir. 1993) (*cited in* Metromedia, 416 F.3d at 145). Vacating the Settlement Order would create an unmanageable situation.

Even assuming that this Court could still order some effective relief, and that the parties who would be adversely affected by the modification of the Settlement had notice of the appeal and an opportunity to participate in the proceedings (a point contested in the briefs), Mr. Bildirici still fails to satisfy the last Chateaugay factor. It is particularly significant that appellant chose

not to pursue with diligence all available remedies to obtain a stay of execution of the Settlement

Order or a stay of the sale. *See, e.g.*, Metromedia, 416 F.3d at 145 ("In the absence of any

request for a stay, the question is not solely whether we *can* provide relief . . . but also whether

we *should* provide relief in light of fairness concerns."). For all of these reasons, this Court

finds that Mr. Bildirici's appeal is equitably moot.

Even if Mr. Bildirici's appeal is not moot, his appeal is without merit under the following

analysis.

### *The Bankruptcy Court's Determination that the Settlement was Reasonable*

A bankruptcy court is required to make an "informed and independent judgment" in

determining whether a settlement is fair and equitable. Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968). Based on the

framework announced in TMT Trailer Ferry, courts in this Circuit have set forth factors for

evaluating settlements. These factors include:

(a) the probability of success should the issues be litigated, versus the present and
future benefits of the settlement without the delay and expense of litigation and
subsequent appeals;

(b) the likelihood of complex and protracted litigation if the settlement is not
approved (with its attendant expense, inconvenience, and delay), including the
difficulty in collecting on the judgment;

(c) the interests of the creditors, including the degree to which creditors support
the proposed settlement;

(d) the proportion of interested parties who support the settlement, and the relative
benefits to be received;

(e) the competency and experience of counsel supporting the settlement, and the
extent to which the settlement is the product of arm's length bargaining; and

14

(f) the nature and extent of releases to be issued

*See* <u>In re Iridium Operating LLC</u>, 478 F.3d 452, 462 (2d Cir. 2007) (citing, *inter alia*, <u>In re WorldCom, Inc.</u>, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006), and <u>In re Drexel Burnham Lambert Group, Inc.</u>, 960 F.2d 285, 292 (2d Cir.1992)); *see also* <u>In re Texaco, Inc.</u>, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

The Second Circuit has emphasized that in evaluating a settlement, a bankruptcy judge need not decide the numerous questions of law and fact raised by the settlement, but rather, should "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." <u>In re W.T. Grant Co.</u>, 699 F.2d 599, 608 (2d Cir. 1983) (internal quotation omitted). This standard means that a bankruptcy court is not required to know all the relevant facts in deciding whether to approve a settlement. *See* <u>Weinberger v. Kendrick</u>, 698 F.2d 61, 74 (2d Cir. 1982) ("The Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one."); <u>Drexel</u>, 138 B.R. at 759 ("Approval of a settlement does not require a 'mini-trial' on the merits.").

In determining whether to approve a trustee's application to settle a controversy, a bankruptcy court should not substitute its judgment for that of the trustee; rather the bankruptcy judge and the district court may "give weight to the opinions of the trustee, the parties, and their attorneys." <u>In re Heissinger Resources Ltd.</u>, 67 B.R. 378, 383 (C.D. Ill. 1986); <u>In re Carla Leather</u>, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984). The bankruptcy judge must also determine whether the proposed settlement is in the best interest of the estate. <u>Depo v. Chase Lincoln First Bank, N.A.</u>, 77 B.R. 381, 383 (N.D.N.Y. 1987).

"A bankruptcy court's decision to approve a settlement should not be overturned unless

its decision is manifestly erroneous and a clear abuse of discretion." In re Purofied Down
Products Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993) (internal quotation omitted), *cited in* In re
Adelphia Communications Corp., 368 B.R. 140, 226 n.162 (Bankr. S.D.N.Y. 2007). The learned
Bankruptcy Judge certainly did not abuse his discretion here. As is clear from the transcript of
the Hearing on August 8, 2007, Judge Drain canvassed the issues, apprised himself of the key
facts, and considered the relevant factors in making his determination. The Bankruptcy Court's
decision that the Settlement did not fall below the lowest point in the range of reasonableness is
prudent for the reasons that follow.

## A.    The Probability of Success in Litigation, Versus the Benefits of Settlement

The Settlement resolved one of the key issues in the underlying litigation, namely the
Lease termination issue. Although the Bankruptcy Court had determined that the Lease had not
terminated pre-petition, the district court dismissed the Landlord's interlocutory appeal of this
issue, finding that the standards for an interlocutory appeal had not been met. The Landlord had
indicated that it intended to litigate this issue to the very end; therefore, the Lease termination
issue was subject to review by the district court and the Second Circuit. Although the Trustee
believed that he would ultimately prevail on this issue and that, on appeal, courts would agree
with the Bankruptcy Court that the Lease had not terminated and could be assigned, the
Landlord's position was credible and the result on appeal was uncertain. If, on appeal, a court
agreed with the Landlord that the Lease had terminated, the result would be disastrous— the
Trustee would have no asset to sell and the Lender and the Debtor's other creditors would receive
nothing. Indeed, Judge Drain noted at the Hearing that the Lease termination issue "is one that is
still subject to appeal. An interlocutory appeal was denied, but that threshold issue is one that I

16

recognize a different court could view differently. . . . This settlement resolves that issue." (Tr. at 40.) Given the uncertainty surrounding this issue and the drastic consequences that could result – not to mention the delay and expense in litigating this issue to its end point – the Bankruptcy Court's approval of the Settlement was reasonable.

The Landlord's position on the issue of the sub-lease proceeds was "less of a meritorious position" than that taken on the Lease termination issue, the Bankruptcy Court concluded; nevertheless, there was "at least some risk that the Landlord would win" if this issue were litigated. (Tr. at 40-41.) Again, the Trustee believed he would ultimately succeed in litigating this point, but if the Landlord prevailed, it would result in an additional $2 million of cure costs, rendering the Lease unmarketable. At the very least, litigating the issue would cause delay and expense. Under the Settlement, this issue was resolved at no additional cost to the estate.

The final issue that would have been subject to litigation is the amount of the fee cure provided to the Landlord and the Lender under the Settlement. The Trustee believes that, through litigation, he could have obtained a reduction in the fees to be paid to the Landlord's counsel. Nevertheless, the Trustee's business judgment was that the Settlement was in the best interest of the Debtor's estate, in light of the uncertain results, delays, and additional legal fees and expenses that would be occasioned by fee litigation. Moreover, the Trustee believed that the Landlord could make a credible argument that it was entitled to the majority of the $1.9 million it sought for fees and expenses (which was reduced to $1.7 million under the Settlement). The Trustee reached this conclusion after reviewing the relevant case law, the fee provisions in the Lease and other financial documents, and the various attorneys' time entries— entries which are set forth in detail in the Trustee's settlement motion. In approving the Settlement, the

17

Bankruptcy Judge undertook a similar analysis. At the Hearing, he stated:

> I approached this issue [of legal fees] initially as I think the Trustee said he did, which is that they must be lower than what the Landlord is claiming. However, I have listened carefully to [the Trustee]. I've gone back also and reviewed the provisions of the lease, and I've carefully reviewed [the Trustee's] application.
>
> And it seems to me that there is a sound and valid basis, first for the amount of the legal fees claimed by [Landlord's counsel]. These were not fees that were simply pulled out of the air, but I am satisfied are supported by appropriate time records and were actually incurred.
>
> . . . [Although] there are issues pertaining to whether the provisions of the Lease actually cover all of the fees incurred, I also believe that the Lease is quite broadly written in respect of the Landlord's right to legal fees; and, moreover, I note that there has been a discount on those fees.
>
> Finally, while I don't believe that the recent Supreme Court ruling in [Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Electric, 127 S. Ct. 1199 (2007)] is as clear-cut as [Landlord's counsel] does, I believe it at a minimum would raise an issue for future litigation as to. . . [a] 'bankruptcy gloss' on pre-petition attorneys' fees.

(Tr. at 41-42.)

With regard to the Lender's fees, Judge Drain stated that:

> The debtor, as part of the cash collateral stipulation, agreed that the bank was entitled to fees. So the analysis would go to the amount of the fees required. And I believe that this Trustee and his professionals, who in my experience are diligent and, frankly, aggressive generally in pursuing the estate's interests, properly did their job in performing due diligence on the bank's fees. Therefore the settlement with the bank is reasonable.

(Tr. at 38.)

Appellant contends that the Trustee's analysis of the Lender's fees was inadequate, resulting in a business decision that fell below the range of reasonableness. (Appellant Reply at 6.) However, the Trustee represented that, in determining that the payment of the Lender's fees

18

was reasonable and appropriate, he applied the three-step analysis suggested by the Bankruptcy Court. Moreover, the Debtor had already agreed to pay all of the Lender's costs and expenses as part of the second cash collateral order, and the Trustee could not have negotiated a reduction in these fees because the Lender insisted on receiving payment of its fees in full as part of the Settlement. (Response to Objection at 3-4.) The Trustee's business judgment is accorded appropriate deference. *See, e.g.,* In re Carla Leather, 44 B.R. at 465.

As is clear from the foregoing analysis, the Bankruptcy Judge made a reasoned, informed, and independent decision on the reasonableness of the Trustee's business judgment that settling the Landlord's and the Lender's fees, rather than litigating the issues, was in the best interests of the estate.

## B.    The Likelihood of Complex, Expensive, and Protracted Litigation if the Settlement Is Not Approved

As explained above, the Settlement resolved several issues that otherwise could have been litigated. Such litigation would have resulted in considerable additional fees and expenses, and, significantly, would have delayed – and perhaps even precluded – the sale of the Lease. Given the contentious nature and the lengthy history of litigation in this case, not to mention the parties' stated intentions to litigate certain issues to the very end, there is a high likelihood that protracted litigation would have ensued in the absence of the Settlement. For these reasons, the Bankruptcy Court did not abuse its discretion in approving the Settlement.

## C.    The Degree to Which the Creditors Supported the Proposed Settlement

The Lender – the Debtor's largest creditor – supported the Settlement and urged the Trustee to proceed with the sale of the Lease. The Lender was concerned that if the Settlement

19

was not approved and litigation continued, the sale of the Lease might not occur.  The Lender

advised the Trustee that it viewed the sale as its best chance of getting paid in full in a "timely"

fashion, and that it wanted to wash its hands of litigation with the appellant. (Motion ¶¶ 47, 103.)

Although the Trustee's primary responsibility is to the Debtor's creditors, *see* In re

Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 375 B.R. 719, 727 (S.D.N.Y. 2007), the

Trustee also considered the interests of the Debtor's equity holders in reaching his business

judgment that the Settlement was in the best interests of all his constituents.  Based on the terms

of the Settlement and the Lease sale, the Trustee believed that a surplus would return to the

Debtor's equity holders and that, as a result, appellant would be in a superior position to bid on

the Lease. (Motion ¶ 30.)

**D.    The Proportion of Interested Parties Who Support the Settlement, and the Relative Benefits to Be Received**

The Landlord, the Lender, and the Trustee all support the Settlement.  The only party that

objected to the Settlement is Debtor's principal, Mr. Bildirici.  Substantial benefits to different

parties flow from the Settlement: the Trustee was able to sell the Lease in a timely fashion for an

amount sufficient to satisfy in full the claims of the Lender and the claims agreed to by the

Landlord as part of the Settlement.  The sale also resulted in a distribution to unsecured creditors.

Had the Settlement not been approved, the previously-discussed litigation would have ensued,

and the relative benefits flowing to the interested parties could have diminished significantly.

For these reasons, approval of the Settlement was reasonable.

**E.    The Competency and Experience of Counsel Supporting the Settlement, and the Extent to Which the Settlement is the Product of Arm's Length Bargaining**

The Landlord, the Lender, and the Trustee were all represented by able counsel.  In

20

approving the Settlement, the Bankruptcy Court commented specifically on the competency and experience of the Trustee and his counsel, using the terms "capable," "diligent," and "aggressive generally" in pursuing the best interest of the estate. (Tr. at 38, 43.) Trustee's counsel has considerable experience with bankruptcy litigation and large settlements. Counsel to the Landlord and the Lender are also highly qualified, and they aggressively pursued their clients' interests in this matter. (Motion ¶ 105.)

As explained above, the Settlement represents a carefully negotiated bargain between the Lender, the Landlord, and the Trustee, which evidences arm's-length negotiating and an absence of undue influence. The Trustee was able to negotiate a reduction in the Landlord's fee cure, the Landlord agreed to forego its claims on the issues of the Lease termination and the sub-lease proceeds, and the Lender agreed to cease its litigation.

The Bankruptcy Court found that the parties engaged in "good-faith settlement negotiations" (Tr. at 44), and no evidence points to the contrary. Therefore, this factor weighs in favor of approval of the Settlement. *See* Iridium, 478 F.3d at 465.

**F.    The Nature and Extent of Releases to Be Issued**

Just as the fee amounts and the agreements to cease litigation were components of the overall bargain struck by the parties and embodied by the Settlement, so were the releases to be issued. At the Hearing, the Bankruptcy Judge questioned the parties about the nature and breadth of releases to be issued and satisfied himself that they were reasonable as part of the Settlement. (Tr. at 8-10, 44-45.) Specifically, he found that the releases and indemnities encompassed a "proper scope for release in this case." (Id. at 45.) Appellant's sparse and unsupported allegations to the contrary (Appellant Br. at 31) do not provide a sound basis to conclude that the

21

learned Bankruptcy Judge abused his discretion in approving the Settlement.

Finally, I should note that appellant suggests that the terms of the Settlement are unfair because the entire litigation stems from a dispute over repairs which, at the time, amounted to no more than $75,000. This argument is unavailing. As Judge Drain pointed out, "it was a dispute, and it was litigated extensively. The repairs were not made. And it was a dispute with a very strong litigation record both ways." (Tr. at 43.) The Lease provided the Landlord with a right to terminate the Lease in the event of a Debtor default, and the Landlord had every right to pursue its remedies under the Lease.

## Conclusion

The record before this Court supports the Bankruptcy Court's decision approving the Settlement as within the range of reasonableness. This appeal is either moot or without merit. The Settlement Order entered by the Bankruptcy Court is AFFIRMED.

Dated: January 23, 2008

_Colleen McMahon_

U.S.D.J.

BY ECF TO ALL COUNSEL

BY FAX TO The Hon. Robert D. Drain, U.S.B.J.

22